STATE OF MONTANA, Appellant

v.

William P. CLARK, Secretary of the Department of the Interior, et al.

No. 83–1982.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 25, 1984.

Decided Nov. 20, 1984.

As Amended Feb. 6, 1985.

A. Raymond Randolph, Washington, D.C., with whom Christopher L. Varner, Washington, D.C., was on the brief, for appellant.

Edward J. Shawaker, Atty., Dept. of Justice, Washington, D.C., with whom Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., was on the brief, for federal appellees.

Dale T. White, Boulder, Colo., with whom Robert S. Pelcyger, Boulder, Colo., was on the brief, for appellee Crow Tribe of Indians. Martin E. Seneca, Jr., Washington, D.C., entered an appearance for the Crow Tribe of Indians.

Before WRIGHT and WALD, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

**J. SKELLY WRIGHT, Circuit Judge:**

The State of Montana appeals a District Court order upholding an Interior Department regulation, 30 C.F.R. § 872.11(b)(3) (1983), against a challenge that it is inconsistent with the organic statute, the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 *et seq.* (1982). The Crow Tribe of Indians joins the federal government in defending the validity of the regulation. In addition to this substantive issue, the case presents the threshold procedural question whether Montana's petition for judicial review of the regulation was timely. We hold that Montana's petition for review satisfied the Act's 60-day filing requirement, *id.* § 1276(1), and is properly before this court. On the merits, we agree with the District Court and find the challenged regulation a reasonable construction of the Act.

## I. BACKGROUND

### A. *General Provisions of the Act*

As its title indicates, the Surface Mining Control and Reclamation Act is designed to meet two related concerns. First, Congress wished to regulate current and future strip mining operations to "protect society and the environment from the adverse effect of surface coal mining operations." 30 U.S.C. § 1202(a). Toward this end, Subchapter V, *id.* §§ 1251–1279, requires the Office of Surface Mining (OSM) to promulgate interim federal standards and provides that a state may take over the regulatory process by submitting a program that meets the approval of the Secretary of the Interior. *See generally In re Surface Mining Regulation Litigation,* 627 F.2d 1346, 1350–1352 (D.C.Cir.1980). Second, Congress sought to provide for reclamation of land and water resources in mining areas abandoned prior to the Act's

enactment on August 3, 1977. *Id.* § 1202(h). Subchapter IV, *id.* §§ 1231–1243, sets up a reclamation fund to be held in trust by the Secretary of the Interior. *Id.* § 1231(a). Fees exacted from current operators of strip mining projects are pooled into the trust, which the Secretary is to distribute to any state or Indian tribe that has submitted an approved "abandoned mine reclamation program." *Id.* §§ 1232(a) & 1235(k). Upon approval of such a program OSM must allocate funds to the state or tribe in a manner that "reflect[s] both the area from which the revenue was derived as well as the national program needs for the funds." *Id.* § 1232(g)(1). In particular, Section 1232(g)(2) states that 50 percent of the funds "collected annually in any State or Indian reservation shall be allocated to that State or Indian reservation."

Nominally, at least, the Act draws a distinction between the role given to Indian tribes in the *regulation* of current mining operations and that allotted to them in the *reclamation* of abandoned mines. Subchapter V gives Indians no direct role in regulating current or prospective mining operations on Indian lands. Believing the jurisdictional status of those areas too unclear to permit effective allocation of the regulatory function, Congress directed the Secretary to submit a report within six months of the enactment of the Act on August 3, 1977 and propose "legislation designed to allow Indian tribes to elect to assume full regulatory authority over the administration and enforcement of regulation of surface mining of coal on Indian lands." *Id.* § 1300(a)–(h).[1] *See* H.R.Rep. 94–189, 94th Cong., 1st Sess. 79 (1975). In the interim Congress decided to protect Indian lands from the potential ravages of surface mining through federal perform-

---

1. OSM commissioned a lengthy study on the subject of surface mining on Indian lands. COUNCIL OF ENERGY RESOURCE TRIBES, THE CONTROL AND RECLAMATION OF SURFACE MINING ON INDIAN LANDS (1979). It was completed in 1979 and, presumably, submitted to the Congress in accord with 30 U.S.C. § 1300(a). Over seven years have now passed since the Act was signed into law, and

Congress has yet to enact the promised legislation clarifying the administrative status of Indian lands. In the 98th Congress the Senate Committee on Indian Affairs held hearings on S.2879, a bill that would directly address the current controversy. But the bill had not been reported out of committee by the time the Congress adjourned *sine die* on October 12, 1984.

ance standards rather than state oversight. *Id.*

Indians are, however, given some role in reclamation of abandoned mines on Indian territory. In the final conference session, and virtually without discussion, House and Senate conferees added Section 1235(k), which reads: "Indian tribes having within their jurisdiction eligible lands [as defined in § 1234] * * * shall be considered a 'State' for the purposes of [Subchapter IV]." *See* H.R.Rep. 95–493, 95th Cong., 1st Sess. 99 (1977). Thus Indian tribes, though denied any participation in the *regulation* of current mining operations, may submit *reclamation* plans and, if approved by the Secretary, administer the funds earmarked for this purpose. Under current OSM policy, however, the practical import of permitting tribes to submit reclamation plans is minimal. Reading the Act to prohibit assignment of reclamation authority to an entity statutorily incapable of exercising full regulatory authority, the Secretary will not approve reclamation plans submitted by a tribe until Congress has clarified the status of Indian lands under the Act. *See* Memorandum in Support of Federal Defendants' Cross-Motion for Summary Judgment at 13–14, *reproduced in* Appendix (App.) at 119–120; 47 Fed.Reg. 28580 (1982).[2] Approval by the Secretary is a prerequisite to any distribution of funds. 30 U.S.C. § 1235.

## B. *The Present Controversy*

This case requires us to review an OSM regulation promulgated to implement Sec-

**2.** The Secretary's approach apparently stems from an interpretation of 30 U.S.C. § 1235(b) & (h). As discussed in text *infra,* the relationships among §§ 1235(b), (h) & (k), 1273(a), and 1300(a) are extremely obscure. The parties do not raise and we do not reach the question whether the policy of postponing distribution of funds collected on non-reservation Indian lands is consistent with or required by the Act. We note, however, that in upholding 30 C.F.R. § 872.11(b)(3) we have examined that regulation in light of OSM's policy to suspend distribution pending congressional clarification.

**3.** 30 C.F.R. § 872.11(b)(3) reads in pertinent part:

tion 1232(g)(2), the provision of Subchapter IV that sets out the allocation formula for distribution of the Abandoned Mine Reclamation Fund to eligible parties. That section mandates that 50 percent of the funds collected "in any State or *Indian reservation* shall be allocated to that State or *Indian reservation*" pursuant to an approved reclamation program. (Emphasis added.) The Act does not define "Indian reservation." It does, however, define "*Indian lands*" as "all lands * * * within the exterior boundaries of any Federal Indian reservation * * * and all lands including mineral interests held in trust for or supervised by an Indian tribe." Section 1291(9).

In order to implement Section 1232(g)(2), in 1978 the Interior Department issued 30 C.F.R. § 872.11(b)(3) after notice and comment. The regulation, which was reenacted in identical form in 1982, largely tracked the language of Section 1232(g) but substituted "Indian lands" for "Indian reservation."[3] Thus under the regulation fees collected from mines beneficially owned by or for Indians, but outside their reservation, would go to the tribe rather than to the state, provided the Secretary approves its reclamation plan. The State of Montana challenges the regulation as "not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). The Secretary of the Interior and the Crow Tribe of Indians maintain that the regulation is a reasonable construction of the Act.

At stake in the case is the right to administer approximately $700,000[4] a year col-

An amount equal to 50 percent of the reclamation fees collected from Indian lands shall be allocated to the Indian tribe having an interest in those lands at the end of the fiscal year in which they are collected for use by that tribe under an approved Indian reclamation plan. * * *

**4.** Brief for appellee Crow Tribe of Indians at 36 nn. 13–14, *citing* Keystone Coal Industry Manual, G. Nielson ed., McGraw Hill, N.Y., N.Y., 1978 Annual Volume at 966–967; 1979 Volume at 998–999; 1980 Volume at 903–904; 1981 Volume at 1076–1078; 1982 Volume at 1126–1128. During each of the years since 1978 the State of

lected from surface mining operations in a 1.13-million-acre tract in Montana known as the "ceded strip." Under a 1904 treaty the Crow Tribe ceded the strip to the United States, but retained a beneficial interest in the substantial coal deposits in the area. *See* 30 U.S.C. § 357 (1982). Thus, though not within the "exterior boundaries of any Federal Indian reservation," 30 U.S.C. § 1291(9), the parties do not seriously dispute that the ceded strip qualifies as "Indian land" as defined by the statute.[5] *Id.* Accordingly, substitution of the phrase "Indian lands" for the statutory language "Indian reservation" has the effect of authorizing the Crow Tribe, rather than the State of Montana, to apply for the funds collected on the ceded strip. We note again that, although the challenged regulation has the effect of depriving Montana of funds derived from the ceded strip, it does *not* actually authorize any distribution to the Crow Tribe. Instead, under OSM's current interpretation of the statute, monies collected from the ceded strip are held in escrow pending congressional clarification of regulatory jurisdiction over Indian lands.[6]

## II. THE TIMELINESS OF THE PETITION FOR JUDICIAL REVIEW

█ If, as the federal appellees argue and the District Court found, Montana's petition for review was not timely, we need not face the statutory question at all. We conclude, however, that the Act's 60-day period for judicial review ran from June 30, 1982, the date of the challenged regulation's republication, and not from October 25, 1978, the date of its original promulgation. Under controlling principles of administrative law, Montana's petition for judicial review, filed 58 days after the regula-

tion's reissuance, was properly before the District Court.

Section 1276(a)(1) of the Act requires that petitions for review of regulations promulgated by the Secretary of the Interior be filed within 60 days of issuance of the regulations. The Secretary initially issued the challenged regulation on October 25, 1978. 43 Fed.Reg. 49940, 30 C.F.R. Part 872. Montana does not dispute that, although it had notice of the regulation and full opportunity to challenge it at that time, it elected not to do so. On December 11, 1981 OSM published "proposed rules" in the Federal Register and solicited comments from the public. 46 Fed.Reg. 60778. One of those rules, the regulation at issue in this case, was identical to that published in 1978. *Id.* at 60781. Apparently, the Secretary's primary motivation for initiating rulemaking procedures was to determine whether the OSM regulations complied with Executive Order 12291, which mandates a weighing of the costs and benefits of agency regulations. 47 Fed.Reg. 28574 (1982).

But in "seeking early and meaningful public participation," the Secretary did not limit comments to consideration of the burdensomeness of the regulations. 46 Fed. Reg. 60779 (1981). Indeed, with reference to 872.11(b)(3) he took the opportunity expressly to explain the substitution of "Indian lands" for the statutory language "Indian reservation." *Id.* at 60782. Two states, Montana and New Mexico, submitted comments objecting to 872.11(b)(3). On June 30, 1982 the agency announced final rules designed to "clarify the relationships and responsibilities of the States, Indian tribes, and Federal Government in implementing" the surface mining regulatory program.

Montana has received approximately $5,000,000 in reclamation funds. *Id.*

**5.** The Crow Tribe also argues that the ceded strip is a "reservation" within the meaning of the Act. *Cf. Little Light v. Crist,* 649 F.2d 682 (9th Cir.1981) (ceded strip not considered part of reservation for purposes of criminal jurisdiction); *Crow Tribe of Indians v. State of Montana,* 650 F.2d 1104 (9th Cir.1981) (discussing possible limitations on state's power to tax pro-

ceeds from coal mined on ceded strip), *cert. denied,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982). Given our resolution of the statutory question, we need not decide whether the ceded strip qualifies as a reservation under 30 U.S.C. § 1232(g)(2).

**6.** At the end of three years any funds not distributed pursuant to 30 U.S.C. § 1232(g)(2) "shall be available for expenditure in any eligible area as determined by the Secretary." *Id.*

47 Fed.Reg. 28574 (1982). The agency expressly considered, responded to, and rejected Montana's comments. *Id.* at 28580, 28592. Fifty-eight days later Montana filed this petition for judicial review of the final rules.

▮ The law in this circuit is clear that an agency decision not to amend long-standing rules after a notice and comment period is reviewable agency action.[7] *See, e.g., Professional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216, 1221 (D.C.Cir.1983). Although acknowledging the general reviewability of a decision not to amend, the District Court believed that *Natural Resources Defense Council v. NRC (NRDC),* 666 F.2d 595 (D.C.Cir.1981), carved from this rule a broad exception for all petitioners who had failed to exercise a prior opportunity to seek judicial review. The rule of *NRDC,* however, does not cut so deeply into the general principle that all final agency action is presumptively reviewable. *Natural Resources Defense Council v. SEC,* 606 F.2d 1031, 1047 (D.C.Cir.1979). *NRDC* merely holds that a protestant, who could have but did not seek review, may not create the basis for a reviewable order by unilaterally petitioning for repeal or amendment of a regulation.[8] To permit any complainant to restart the limitations period by petitioning for review of a rule, the *NRDC* court recognized, would eviscerate the congressional concern for finality embodied in time limitations on review.

This concern is not present in the instant case. Montana did not contrive to restart the 60-day period by unilaterally seeking repeal of a long-standing regulation. Indisputably, the agency itself initiated rulemaking procedures in 1981. It held out Section 872.11(b)(3) as a proposed regulation, offered an explanation for its language, solicited comments on its substance,

and responded to the comments in promulgating the regulation in its final form. Given the affirmative indications that the agency evaluated the entire substance of the regulation, it matters little whether the agency's primary focus was on bringing the comprehensive regulatory scheme in compliance with Executive Order 12291. Unless we are to consider the notice and comment process a meaningless gesture, the order of June 1982 reissuing Section 872.11(b)(3) constitutes final agency action and is reviewable under the Administrative Procedure Act, 5 U.S.C. § 704. *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697 (1967). The 60-day period for review began on June 30, 1982 and, accordingly, the petition was timely.

### III. THE STATUTORY QUESTION

#### A. *Standard of Review*

This case requires us to reconcile two superficially conflicting principles of statutory interpretation. Montana raises a pure question of law, whether the challenged regulation is inconsistent with the organic statute. Accordingly, it invokes the principle that the judiciary is uniquely responsible for the final determination of the meaning of statutes. *FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965). The federal appellees, on the other hand, acknowledge the purely legal nature of the question but insist that this court should afford substantial deference to the Department of the Interior's construction of a statute it is entrusted to administer. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* —— U.S. ——, —— & n. 14, 104 S.Ct. 2778, 2782 & n.14, 81 L.Ed.2d 694 (1984) (hereinafter cited as

---

7. The Administrative Procedure Act, 5 U.S.C. § 551(5) (1982), defines "rule making" as the "agency process for formulating, *amending,* or repealing a rule." (Emphasis added).

8. Moreover, the court in *NRDC* explicitly acknowledged that where, as here, the petitioner challenges the *substantive* validity of a rule,

failure to exercise a prior opportunity to challenge the regulation ordinarily will not preclude review. 666 F.2d at 602. *See also Functional Music, Inc. v. FCC,* 274 F.2d 543 (D.C.Cir.1958), *cert. denied,* 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959).

*Chevron* only to 104 S.Ct.) (collecting cases).

The conflict between these two principles, both thoroughly entrenched in the case law, *Trailways, Inc. v. ICC,* 727 F.2d 1284, 1287 (D.C.Cir.1984), is more apparent than real. Beyond question, it is the unique province of the judiciary to "say what the law is," *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177–178, 2 L.Ed. 60 (1803). But the exercise of this function does not preclude affording deference to an agency's construction of its enabling statute. For, properly understood, deference to an agency's interpretation constitutes a *judicial* determination that Congress has delegated the norm-elaboration function to the agency and that the interpretation falls within the scope of that delegation. Monaghan, *Marbury and the Administrative State,* 83 Colum.L.Rev. 1, 25–28 (1983); *Trailways, Inc. v. ICC, supra,* 727 F.2d at 1288. Thus the court exercises its constitutionally prescribed function as the final arbiter of questions of law when it evaluates the breadth of congressional delegation and, in so doing, determines the degree of deference warranted in the particular controversy before it.

The recent decision in *Chevron, supra,* elaborates on these principles and sets out the appropriate methodology for ascertaining whether to afford deference to an agency construction of its governing statute. At the outset, "if the intent of Congress is clear, that is the end of the matter," and contrary agency interpretations must be invalidated. 104 S.Ct. at 2781. To conclude otherwise would be to adopt the absurd position that Congress delegated authority to vitiate or disregard its intent.

Isolating the intent of Congress, of course, is often easier said than done. Thus it has become axiomatic that we must assume that Congress expresses its intent through the ordinary meaning of the words it uses. *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983). But the language of a statute is not an inevitable proxy for legislative intent. *Watt v. Alaska,* 451 U.S. 259, 266 n. 9, 101 S.Ct. 1673, 1678, n. 9, 68 L.Ed.2d 80 (1981); *Water Transport Ass'n v. ICC,* 715 F.2d 581, 593 (D.C.Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 998, 79 L.Ed.2d 231 (1984). If the language of one statutory phrase, however "plain," collides with the literal command of another or of the statute as a whole, the resulting ambiguity necessitates examination of extrinsic evidence of legislative intent to reconcile the conflict. *Chemehuevi Tribe of Indians v. FPC,* 420 U.S. 395, 403–405, 95 S.Ct. 1066, 1072–73, 43 L.Ed.2d 279 (1975). Similarly, if the "plain" language would lead to a patently "absurd" result, the assumption that the literal words embody legislative intent has considerably less force. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978).

■ If examination of the statutory language and, where appropriate, extrinsic evidence reveals that "Congress has not directly addressed the precise question at issue," the court's task is to determine whether to afford deference to an agency's effort to explicate the ambiguous language or fill the statutory void. *Chevron, supra,* 104 S.Ct. at 2782. The cases divide into two categories, roughly paralleling the sometimes fuzzy distinction between legislative and interpretive rules. First, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute * * *." *Id.* See also *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). In this context we are directed by the Administrative Procedure Act, 5 U.S.C. §706(2)(A), as well as the Supreme Court, *Chevron, supra,* 104 S.Ct. at 2782, to affirm the agency's construction unless arbitrary, capricious, or manifestly contrary to law. Second, if "the legislative delegation to an agency * * * is implicit rather than explicit," *Chevron* commands that the court affirm an agency's interpretation of a statute it is entrusted to administer provided that it is "reasonable." *Id.* See also *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 11, 100 S.Ct. 883, 890, 63 L.Ed.2d 154 (1980). Deference in this context, no less than in the case of explicit delegation, reflects the deep institutional premise that it is for the agency in its capacity as delegate of the legislative branch, not the court, to make policy within the boundaries assigned to it by Congress. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1979).

■ Applying these principles to the case at hand, we evaluate first whether the statutory language of Section 1232(g)(2) re-

flects a congressional intent that fees collected from mines on Indian lands outside the exterior boundaries of reservations be distributed to states rather than the tribe.[9] The literal words of the statute are presumptively conclusive of legislative intent, but that presumption may be defeated by contrary indications of intent also evident on the face of the statute. In that event, examination of extrinsic evidence to ascertain the congressional purpose would be necessary.

If we determine that Congress did not expressly foreclose the construction embodied in the challenged regulation, we must determine whether the agency's construction warrants deference by measuring the breadth of delegation, if any, to the agency to fill gaps or resolve statutory ambiguities and by determining whether the agency's interpretation fell within the boundaries assigned to it.[10] On the one hand, as Montana correctly notes, the absence of several of the typical indicia of broad congressional delegation to the agency counsels against deference. *Trailways, Inc. v. ICC, supra,* 727 F.2d at 1288. In particular, the construction embodied in 30 C.F.R. § 877.-11(b)(3) required no technical or specialized expertise, a circumstance ordinarily weighing against deference.[11] *Alexander v. FERC,* 609 F.2d 543, 548 (D.C.Cir.1979). Similarly, the statutory language at the center of this controversy is not "of such inherent imprecision * * * that a discretion of almost legislative scope was necessarily contemplated." *Association of Data Processing Service Organizations, Inc. v. Board of Gov. of FRS,* 745 F.2d 677, 697 (D.C.Cir.1984).

On the other hand, one consideration weighs decisively in favor of deference. As will be developed more fully below, Congress expressly recognized that the jur-

isdictional status of Indian lands was too uncertain to permit effective allocation of regulatory authority for those regions. 30 U.S.C. §§ 1273, 1300. *See also* H.R.Rep. 94–189, 94th Cong., 1st Sess. 79 (1974). Accordingly, it provided that, within a matter of months, it would return to the legislative task and clarify the question. Over seven years have now passed and the promise of congressional clarification remains unfulfilled. In the meantime, the Secretary is under a present obligation to collect fees for and administer the reclamation fund. Given this rather remarkably mixed message, we can only conclude that, pending congressional clarification, Congress afforded the Secretary substantial discretion in the administration of the fund on Indian lands. Thus deference is appropriate, and we will uphold the agency's interpretation provided only that it is not expressly foreclosed by congressional intent and that it is reasonable. *Chevron, supra,* 104 S.Ct. at 2782.

## B. *The Plain Language*

Montana maintains that the plain meaning of the statute is controlling. It points out that Congress used the phrase "Indian reservation" throughout Subchapter IV, *see, e.g.,* 30 U.S.C. § 1239(b–c), and that Congress clearly knew the difference between the phrase "Indian reservation" and the statutorily defined term "Indian lands," which includes both reservations and lands beyond the exterior boundaries of reservations either owned by or beneficially held for an Indian tribe. *See, e.g., id.* §§ 1291(9) & 1300(h). Montana also finds relevant Section 1273, which specifically states that, except as provided in Section 1300, the provision that commissions a study on the question, the Act "shall not be applicable to Indian lands." Thus, in its view, the only

---

**9.** We recognize that Montana has elected to challenge 30 C.F.R. § 872.11(b)(3), which allocates funds to Indian tribes, rather than § 872.11(b)(2), which allocates funds to states. Montana makes clear, however, that its objection to § 872.11(b)(3) is that it has the effect of "depriv[ing] the State of Montana and its citizens of funds needed to reclaim lands and water spoiled by coal mining." Brief for appellant at 22. Indeed, were this not the basis of its complaint, we doubt the State would have standing to mount this challenge at all. *See* text at pp. 748–49 *infra.* Thus the critical inquiry is not only whether Congress intended that tribes be allocated funds generated by non-reservation In-

dian lands, but also whether it intended that states be allocated such funds.

**10.** *See, e.g., Western Coal Traffic League v. United States,* 694 F.2d 378, 383 (5th Cir.1982) (in reviewing agency's construction of its governing statute court must determine whether agency has transgressed bounds fixed by Congress), *cert. denied,* — U.S. —, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984).

**11.** *See also Trailways, Inc. v. ICC,* 727 F.2d 1284, 1288 (D.C.Cir.1984) (established administrative practice when the statute was enacted is an indicium of delegation).

ambiguity in the statute was injected by the Secretary when he substituted "Indian lands" for "Indian reservation" in the challenged regulation.[12]

There can be no denying the initial appeal of Montana's "plain meaning" argument. Ultimately, however, we are not persuaded. The fundamental, and in the end fatal, deficiency in Montana's reading of the statute is its failure to acknowledge, much less account for, language that equally plainly compels the conclusion that Congress did not intend that funds derived from Indian lands be distributed to the states.

Montana makes clear that the gravamen of its complaint is that the regulation deprives the State of funds needed to reclaim lands and water spoiled by coal mining. Brief for appellant at 22. The State also asserts that it intends to use the funds to reclaim abandoned mines on non-reservation Indian lands.[13] *Id.* at 25. Yet the Act unambiguously denies the state the power

to administer funds on any Indian lands, on or off the reservation. No state is eligible for funds under Section 1232(g)(2) until it has submitted, and the Secretary has approved, a "State reclamation program." *Id.* § 1235. The Act defines "State program" to mean "a program established by a State pursuant to section 1253 of this title to regulate * * * reclamation operations on *lands within such State.*" [14] *Id.* § 1291(25) (emphasis added). And, finally, the Act defines "lands within such State" to mean "all lands within a State other than Federal lands and Indian lands." *Id.* § 1291(11). Because "Indian lands" include "mineral interests held in trust for * * * an Indian tribe," *id.* § 1291(9), the Act explicitly denies Montana the power to administer federal funds to reclaim abandoned mines on the ceded strip. Thus granting Montana the funds generated by current mining operations on the ceded strip would violate the clear command of Section 1232(g)(1) that "[t]he geographic allocation of expenditures from the fund

---

**12.** Montana also suggests that the recent decision in *Escondido Mutual Water Co. v. LaJolla, Rincon, San Pasqual, Pauma and Pala Bands of Mission Indians,* —— U.S. ——, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984), is "directly on point." Supplemental brief for appellant at 2. We disagree. The statutory language at issue in *Escondido* was, no doubt, similar to that at issue in this case. Far more importantly, however, *Escondido* arose under an entirely different statute, the Federal Power Act, 16 U.S.C. § 797(e). Our task is to determine Congress' intent under the Surface Mining Control and Reclamation Act of 1977. Unless the language of the Federal Power Act somehow informs this inquiry, it is of no relevance at all. Given the wholly different objectives and structure of the two Acts, and the absence of any evidence whatever that the 95th Congress was in any way influenced by the Federal Power Act, we find the language and subsequent judicial construction of that Act irrelevant to the interpretive task before us in this case.

**13.** This assertion is implicit in Montana's policy argument that "it makes good sense" for states to undertake reclamation projects when non-Indians control the surface. Brief for appellant at 25. As discussed below, *see* note 23 *infra* and accompanying text, this alleged policy finds no support in the legislative history.

**14.** Because § 1291(25) defines "State program" to mean a program "pursuant to section 1253," a

provision found in Subchapter V, Montana argues that the statutory definition of "State program" cannot refer to a state *reclamation* program established under Subchapter IV. This contention is entirely without merit. Section 1235(c) precludes approval of a state reclamation program unless the state has an approved "State regulatory program pursuant to section 1253." Approval, if any, of a state regulatory program can extend only to lands "within such State," a phrase defined to exclude Indian lands. Thus, under § 1235(c), approval of a § 1253 regulatory program that is broad enough to cover the region in question is a prerequisite to approval of a reclamation program covering that same region. This narrow statutory argument aside, we consider it highly unlikely that Congress would undertake to define "State program" and yet intend that the definition exclude operations explicitly referred to as "State programs" merely because they are provided for in Subchapter IV. *See* § 1235(a) & (d) (referring to state reclamation programs as "State programs").

Because the regulation and reclamation provisions of the statute are so interwoven, Montana's plain meaning argument has required us to examine in passing several of the Act's provisions for regulation of current and prospective mining operations. We wish to make clear that our decision is limited to the narrow question presented by this case, the rationality of a regulation providing for distribution of reclamation funds.

shall reflect \* \* \* the area from which the revenue was derived." [15]

Another "plain language" obstacle that Montana fails to confront, much less surmount, is the directive of Section 1235(k) that "Indian tribes having within their jurisdiction eligible lands pursuant to section 1234 of this title or from which coal is produced, shall be considered as a 'State' for the purposes of this subchapter." Once this provision is read back into Section 1232(g)(2), also in Subchapter IV, the supposedly plain meaning of that provision's allocation language becomes anything but clear. Section 1232(g)(2) provides, with emphasis added, that 50 percent of the "funds collected annually in any *State* or Indian reservation shall be allocated to that *State* or Indian reservation." But Section 1235(k) requires that the Secretary treat as a "state" any tribe having jurisdiction over lands that produce coal. Thus, assuming that the Crow Tribe has "jurisdiction" over the ceded strip within the meaning of Section 1235(k),[16] 50 percent of the funds derived from the region go to it, and not

Montana, a result entirely consonant with the challenged regulation.[17]

Finally, Montana's reliance on Section 1273 to "plainly" support its position fails to convince. Section 1273(a) states that "the provisions of this chapter shall not be applicable to Indian lands [except in accord with Section 1300]." This provision, of course, directly conflicts with Section 1235(k), which treats tribes having jurisdiction over coal-producing lands as states for purposes of Subchapter IV.[18] More importantly, Section 1273(a) defeats Montana's right to the funds collected on the ceded strip as much as it defeats that of the tribe. Somewhat surprisingly, Montana has elected to challenge 30 C.F.R. § 872.11(b)(3), which allocates funds from Indian lands to the tribes, rather than 30 C.F.R. § 872.-11(b)(2), which exempts from funds allocated to the states fees collected from "Indian lands."[19] At bottom, however, as Montana admits, brief for appellant at 24, its complaint stems from its belief that it, not the Crow Tribe, is entitled to funds collected on

---

**15.** *See also* 30 U.S.C. § 1235(e) (to be approved a state reclamation plan must identify the areas to be reclaimed and the legal authority to perform such work).

**16.** The Crow Tribe maintains that the State clearly is without jurisdiction to oversee reclamation projects on Indian lands. Brief for appellee Crow Tribe of Indians. The State of Montana, on the other hand, has little doubt that it does have jurisdiction, at least over off-reservation Indian lands. Brief for appellant at 25. Whether the Crow Tribe or the State has administrative jurisdiction over regions like the ceded strip, of course, is not clear. Precisely this uncertainty compelled Congress to postpone final resolution of the locus of regulatory authority in Indian lands. *See* 30 U.S.C. § 1300(h); H.R.Rep. 94–189, 94th Cong., 1st Sess. 79 (1975).

**17.** We acknowledge that using § 1235(k) to expand the definition of "state" in § 1232(g)(2) instead of simply using the phrase "Indian lands" rather than "Indian reservation" constitutes peculiar drafting. Accordingly we do not give the literal command of § 1235(k) dispositive force. We note only that the "plain" meaning of the statute leads us down contradictory and mutually exclusive paths, a result that justifies our looking beyond the four corners of the Act to determine the intent of Congress.

**18.** The legislative history illuminates the source of this inconsistency. Throughout most of the Act's history Congress assumed that Indian tribes would have no direct role in either reclamation or regulation. The precedessors of §§ 1273(a) and 1300 were present in the bills passed by both the 93rd and 94th Congresses as well as in the bill that ultimately was enacted. The provision that was to become § 1235(k), on the other hand, was added in the final conference session on the bill before it was passed by the 95th Congress. Thus it appears that at the last moment Congress elected to give tribes a direct role in overseeing *reclamation* programs but failed to alter those provisions, such as § 1273, that assumed that tribes were to be entirely without administrative authority.

**19.** 30 C.F.R. § 872.11(b)(2) reads in pertinent part:

An amount equal to 50 percent of the reclamation fees collected from within a State shall be allocated at the end of the fiscal year in which they are collected for use in that State under an approved State Reclamation Plan. Reclamation fees collected from Indian lands shall not be included in the calculation to be allocated to a State. \* \* \*

30 C.F.R. § 872.11(b)(3), which allocates funds derived from Indian lands to the Indian tribe having an interest in those lands, is quoted in note 3 *supra*.

the ceded strip. Indeed, were this not the injury that motivates the petition for review, we doubt Montana would have standing to challenge Section 872.11(b)(3) at all. But if the essence of Montana's complaint is its view that the Act confers on it a right to funds generated by the ceded strip, Section 1273 stands "plainly" and squarely in its path. For the literal terms of that section say that the Act "is not applicable" to Indian lands at all. If that is the case, no more than the Crow Tribe does Montana have a present right to funds derived from mining operations either inside Indian reservations or beyond their exterior boundaries. 30 U.S.C. § 1291(11).

In short, Montana's focus on the "plain meaning" of the term "Indian reservation" in Section 1232(g) is far too narrow. The equally plain but conflicting command of other terms of the statute, though not independently dispositive, is more than sufficient to defeat even the strong presumption that the words of the statute, without more, embody Congress' intent. Indeed, the ambiguities present on the face of the statute make an examination of the legislative history for evidence of that intent both necessary and appropriate.

## C. *The Legislative History*

We are frank in admitting that our extensive review of the labyrinthine legislative history has yielded few certain conclusions. The long and convoluted path toward final enactment of the Act began in 1968. Hearings on S.3132, S.3126, and S.217 Before Senate Committee on Interior and Insular Affairs, 90th Cong., 1st Sess. (1968). The 93rd Congress passed an earlier version of the bill in 1974, S.425, 93d Cong., 2d Sess. (1974), but President Ford vetoed it. The 94th Congress passed a similar bill in 1975, H.R.25, 94th Cong., 1st Sess. (1975), but it too met with a presidential veto. The legislation as it now stands was enacted by the 95th Congress and signed into law by President Carter in 1977. Each Congress made revisions in the earlier draft, but often carried over lan-

guage that the subsequent changes made obsolete or internally inconsistent. Especially obscure is the relationship between Sections 1232(g), 1273(a), 1235(k) and 1300(a–h).

From this tangled skein, however, one aspect of the congressional purpose emerges with clarity. Believing that the jurisdictional status of non-reservation "Indian lands" was too unclear to permit effective allocation of regulatory authority in these regions,[20] Congress expressly postponed resolution of the question and directed that the Secretary of the Interior submit a report within six months of the enactment of the Act and "propose[ ] legislation designed to allow Indian tribes to elect to assume full regulatory authority over the administration and enforcement of regulation of surface mining of coal on Indian lands." 30 U.S.C. § 1300(a). No evidence supports Montana's view that the language of Section 1232(g)(2) reflects a finely calibrated intent to permit states to reclaim non-reservation Indian lands pending congressional clarification, while limiting tribal jurisdiction to reservations. Nor does the legislative history support Montana's assertion that Congress intended that non-Indians reclaim the surface in regions where a tribe controls the subsurface minerals. In sum, we find 30 C.F.R. § 872.11(b)(3), read in conjunction with the Secretary's policy to suspend distribution of funds collected on non-reservation Indian lands, far more consonant with congressional objectives than the position asserted by Montana.

1. *The Indian lands question in the 93rd, 94th, and 95th Congresses.* In the 93rd Congress the bill that emerged from the House Committee on Interior and Insular Affairs would have given Indians full administrative authority over both reclamation and regulation of mines on "Indian lands." H.R.11500, 93rd Cong., 2d Sess. §§ 301–311 (1974). The allocation language of current Section 1232(g) was not in the bill. But the House's clear intent was to treat Indian tribes as states and to designate Indian lands, even those off the

20. *See, e.g.*, H.R.Rep. 94–189, 94th Cong., 1st    Sess. (1974).

reservation, *id.* § 705(8), under the regulatory authority of the tribes that controlled them. H.R.Rep. 93–1072, 93d Cong., 2d Sess. 115–116 (1974).

The Senate took a different approach. *See* S.425, 93d Cong., 2d Sess. §§ 115–116 (1973). Section 217(a) of the bill passed by the Senate stated that, except as provided in Section 403, "the provisions of this Act shall not be applicable to Indian lands." Section 403, the progenitor of Section 1300 in the current Act, commissioned the Secretary of the Interior to produce and submit to Congress a study on regulatory authority over Indian lands. The Senate Report, S.Rep. 93–402, 93d Cong., 1st Sess. (1973) (hereinafter cited as *Senate Report*), makes explicit the intent to "exempt temporarily all Indian lands from the Act," *id.* at 74, including lands controlled by a tribe but beyond the boundaries of its reservation. S.425, 93d Cong., 1st Sess. § 510(9) (1973). The Senate bill provided that the federal government, not the states, would oversee surface mining on Indian lands pending congressional clarification of the question. The Senate bill was far clearer about the mechanisms for interim federal control of regulation than of reclamation. *See, e.g., Senate Report* at 74. But there is no doubt that the Senate envisioned no role for the states on Indian lands. To be eligible to receive reclamation funds a state must have jurisdiction over "lands within such state," S.425, 93d Cong., 2d Sess. § 204(1) (1973), a phrase defined to "insure that the States, through their State programs, will not assert any additional authority over * * * Indian lands." *Senate Report* at 75.

In conference the conferees largely acceded to the Senate's approach to Indian regulatory authority. *See* H.R.Rep. 93–1522, 93d Cong., 2d Sess. (1974) (hereinafter *Conference Report*). The bill that emerged from conference gave Indians no authority to submit plans for either regulation or reclamation, and, like the original Senate bill, commissioned a study to investigate the subject of administrative jurisdiction over Indian lands. The study was to include proposed legislation that would "allow Indian tribes to elect to assume full regulatory authority over the * * * regulation of surface mining of coal on Indian lands." *Id.* at 68 (§ 712(a)).

The extent of state jurisdiction over non-reservation Indian lands was slightly less clear in the bill as it emerged from conference and later passed by both Houses than in the original Senate bill. The defined term "lands within such state," which in S.425 had explicitly excluded all Indian land from the ambit of a state reclamation program, was dropped; *compare* S.425, 93d Cong., 1st Sess. § 204 (1973), *with Conference Report* at 20 (§ 503); and the language allocating 50 percent of the fees derived from an Indian reservation or a state to that reservation or state was added. *Id.* at 12 (§ 401(e)). One could plausibly draw from these changes the inference that the conferees, though wishing ultimately to give tribes regulatory authority over non-reservation Indian lands, *id.* at 68 (§ 712(a)), provided in the interim that states could administer reclamation plans on the off-reservation portions of those lands as long as the fees derived from reservations proper return to the reservation.

For several reasons this inference is unconvincing. The conferees could not have been clearer that ultimately they wanted Indians to administer funds on non-reservation Indian lands, *id.*; and not a whit of evidence suggests an intent that the states oversee the funds in the interim period. Indeed, though Section 401(e), unlike the bill in final form,[21] speaks only generally about the administrative vehicles through which the 50 percent allocation would be implemented, a state could only have direct control of the funds if it had submitted an approved state reclamation program. The bill passed by the 93rd Congress, no less than either the original Senate or House bills, limited the jurisdiction of state programs to lands other than "Federal lands" and "Indian lands" both on and off the

---

**21.** *Compare* 30 U.S.C. § 1232(g)(2) *with Confer-* *ence Report* at 12 (§ 401(e)).

reservation. *Id.* at 60–61 (§ 701(7), (8), (9), & (11)). Thus no evidence supports the contention that the 93rd Congress intended that the states oversee reclamation on non-reservation Indian lands or otherwise benefit from funds collected in such areas during the interim period prior to enactment of clarifying legislation.

The history of the legislation during the 94th Congress confirms this view. The Indian lands provisions were carried over essentially without change from the 93rd Congress. The Conference Report, H.R. Rep. 94–189, 94th Cong., 1st Sess. 79 (1975), makes clear that, pending enactment of legislation giving direct regulatory jurisdiction to the tribes, the combination of federal performance standards and tribal leasing authority would protect Indian lands from the potentially destructive effects of surface mining. The focus of the Conference Report was on regulation and not reclamation. But, given their recognition of the "special jurisdictional problems [associated with] lands held in trust for Indian tribes," *id.*, the conferees clearly intended that the states be given no role at all in the administration of reclamation programs on non-reservation Indian lands.

In the 95th Congress the surface mining bill came out of the appropriate Senate and House Committees in a form virtually identical to the bills passed by the 93rd and 94th Congresses but vetoed by President Ford. *See* S.Rep. 95–128, 95th Cong., 1st Sess. (1977); H.R.Rep. 95–218, 95th Cong., 1st Sess. (1977). On the Senate floor, however, Senator Abourezk introduced an amendment to the Senate bill that would have given Indian tribes the option of assuming full regulatory and reclamation authority over all Indian lands. 123 Cong. Rec. 15606–15607 (1977). The amendment, which was passed without opposition or serious debate, was similar to the approach adopted, but later abandoned, by the House during the 93rd Congress. This time, however, the roles were reversed. In confer-

ence the House's current view that legislation concerning Indian lands should be postponed pending completion of a study prevailed, and the Abourezk amendment was deleted. However, entirely without explanation or comment—either in conference or later on the floor of either house—the conferees added Section 1235(k), which for purposes of reclamation (but not regulation) treated Indian tribes like states. Thus, to the extent the 95th Congress altered the status of Indians under the Act at all, the change was in the direction of expanding their role in reclamation of abandoned mines on coal-producing lands within their jurisdiction. As in the 93rd and 94th Congresses, at no time did the 95th Congress evince an intent to afford states reclamation authority on non-reservation Indian lands. Indeed, once again the conferees made clear that their uncertainty about the jurisdictional status of those lands justified postponing legislation until a study on the question had been completed. H.R.Rep. 95–493, 95th Cong., 1st Sess. 114 (1977).

In sum, examination of the 95th Congress' deliberations, no more than those of earlier Congresses, yields not even a hint that the choice of the phrase "Indian reservation" in Section 1232(g)(2) reflected a conscious decision to treat on- and off-reservation lands differently. Indeed, indiscriminate use of the phrases "Indian lands" and "Indian reservations" throughout the long history of the Act suggests an inadvertent drafting inconsistency far more than a deliberate policy choice. *See, e.g.,* S.Rep. 95–128, 95th Cong., 1st Sess. 67 (1977) ("Fifty percent of the revenues derived from * * * *lands of an Indian tribe* are to be returned to that * * * Indian tribe." (emphasis added)).[22] Nor is there any support at all for Montana's assertion that Section 1232(g)(2) embodies a congressional determination that "it makes good sense" for non-Indians to oversee reclamation of lands the subsurface of which is beneficially owned by or for Indians. Brief

---

**22.** *See also* S.Rep. 95–128, 95th Cong., 1st Sess. 113 (1977) (letter of Secretary of the Interior

Cecil Andrus); 121 Cong.Rec. 13377 (1975) (comments of Senator Melcher).

for appellant at 25.[23] Rather than indicating a finely tuned calibration designed to differentiate among the various kinds of Indian lands, the overwhelming evidence suggests Congress' desire temporarily to postpone determining the locus of regulatory authority over all lands in which Indians have an interest.

2. *Congressional objectives and the challenged regulation.* Measured against Congress' clear objective to postpone resolution of the administrative status of Indian lands, we find the Secretary's construction of the Act far more convincing than that advanced by Montana. Montana asserts, albeit indirectly, that it has a present right to funds collected on the ceded strip. But, given Congress' clear intent to deprive states of reclamation authority over non-reservation Indian lands, we find it inconceivable that Congress wished states to benefit from funds derived from those areas. The bill passed by the 93rd Congress, like those passed by the 94th and 95th Congresses and finally signed into law in 1977, makes explicit the link between administrative jurisdiction and the right to funds. Throughout the Act's evolution it directed that the funds "reflect * * * the area from which the revenue was derived * * *." *Compare* 30 U.S.C. § 1232(g)(1), S.425, 93d Cong., 1st Sess. § 401(e) (1974), *and* H.R. 25, 94th Cong., 1st Sess. § 401(e) (1975). The link is especially clear in the final form of the Act. Section 1232(e) directs that a state reclamation plan must "identify the areas to be reclaimed" and the "legal authority" to undertake reclamation operations.[24]

In contrast, the Secretary's decision to award funds derived from non-reservation Indian lands to the tribes, but to condition actual distribution on the enactment of clarifying legislation, is fully in accord with the congressional design. It conforms with both Congress' explicit intent ultimately to give tribes "full regulatory authority over * * * regulation of surface mining of coal on Indian lands," 30 U.S.C. § 1300(a), and Congress' equally clear intent to postpone the actual granting of administrative authority on Indian lands pending further study of the difficult jurisdictional questions inherent in such regions. The Secretary's commendable effort to reconcile the often starkly contradictory commands of the Act is both reasonable and consistent with the general intent of Congress. Accordingly, under the controlling standard of review, the Secretary's construction of the statute he is entrusted to administer merits deference. *Chevron, supra,* 104 S.Ct. at 2782.

## III. Conclusion

Under controlling principles of administrative law, Montana's petition for review of 30 C.F.R. § 872.11(b)(3) is timely. Because the challenged regulation is in accord with congressional objectives and is a reasonable construction of the Act, we affirm its validity.

*Affirmed.*

---

**23.** Indeed, both the language and the history of the Act imply that Congress did envision that Indians exercise regulatory authority even in those regions in which their interest extends only to the subsurface. The House bill in the 93rd Congress and the Senate bill in the 95th Congress clearly would have given Indians jurisdiction over lands both within and without the exterior boundaries of the reservation. Moreover, in § 1300 of the Act Congress commissioned the Secretary of the Interior to submit proposed legislation "designed to allow Indian tribes to elect to assume full regulatory authority [defined to include both regulation and reclamation (30 U.S.C. § 1291(22) & (24) ) ] over * * surface mining on Indian lands [defined to include non-reservation land, *id.* § 1291(9) ]." Whether the policy urged by Montana is a

sound one or even permissible can be debated. In statutory construction, however, "questions of public policy cannot be determinative of the outcome unless specific policy choices fairly can be attributed to Congress itself." *Dawson Chemical Co. v. Rohm & Haas Co.,* 448 U.S. 176, 220–221, 100 S.Ct. 2601, 2625–2626, 65 L.Ed.2d 696 (1980).

**24.** Absent such "authority," approval of a state program, a prerequisite of fund distribution under § 1232(g)(2), would violate the congressional objective that a state be authorized to protect the environment against the ravages of surface mining only to the extent it is an adequate surrogate for direct federal control.